**CHEVRON CHEMICAL COMPANY,**
**Plaintiff,**

**v.**

**Douglas M. COSTLE, Defendant.**

**Nos. C–76–1552–WWS, C–76–1768–WWS**
**and C–76–2222–WWS.**

United States District Court,
N. D. California.

Jan. 25, 1978.

Anthony P. Brown, James N. Roethe, Patrick L. Finley, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., G. William Hunter, U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., Bruce E. Titus, Paul F. Figley, Attys., Civ. Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

WILLIAM W SCHWARZER, District Judge.

Plaintiff Chevron Chemical Company has filed these actions against the Administrator of the Environmental Protection Agency ("the Administrator"). This Court has jurisdiction under Section 10(c) of the Federal Environmental Pesticide Control Act ("FIFRA" or "the act") (7 U.S.C. § 136h(c)), Section 10 of the Administrative Procedure Act (5 U.S.C. § 706), and 28 U.S.C. § 1331. Chevron seeks declaratory and injunctive relief against the threatened disclosure by defendant of test data on certain fungicides and insecticides submitted by Chevron to the Environmental Protection Agency ("EPA" or "the agency") and its predecessor agencies.

### The Background Facts

Chevron is a corporation engaged in the business of developing, producing and marketing fungicides and insecticides for agricultural and industrial use. From approximately 1956 until 1976, Chevron submitted test data to the United States Department of Agriculture, the Food and Drug Administration and the EPA pursuant to pesticide registration requirements in effect from time to time. The data supported the registrations of pesticides produced by Chevron under the trademarks Monitor, Orthocide (also known as Captan), Phaltan and Dibrom. By letters dated June 22, July 13, July 19, and August 19, 1976, defendant notified Chevron that he intended to release data concerning these products unless Chevron took appropriate action in the courts. Chevron alleges that public disclosure of the test data would violate FIFRA, the Freedom of Information Act (5 U.S.C. § 552), the Trade Secrets Act (18 U.S.C. § 1905) and the Fifth Amendment of the United States Constitution.

FIFRA was originally enacted in 1947 (7 U.S.C. § 135 *et seq.*) ("FIFRA of 1947"). At that time it applied only to pesticides shipped in interstate commerce and was administered by the Department of Agriculture. FIFRA of 1947 required that every pesticide marketed in interstate commerce be registered, and that the manufacturer, to obtain such a registration, had to demonstrate the safety and efficacy of the pesticide to the satisfaction of the Department. If the use of a pesticide could result in a residue in or on food crops, a tolerance had to be established pursuant to Section 408 of the Food, Drug and Cosmetic Act (21 U.S.C. § 301 *et seq.*, specifically § 346a). Substantial amounts of information and research and test data were required to be submitted in support of an application for registration. Effective December 3, 1970, the administration of FIFRA was transferred to the EPA.

In 1972, Congress adopted the Federal Environmental Pesticide Control Act of 1972 (7 U.S.C. § 136, et seq.) which substantially amended FIFRA of 1947 in various respects. Full implementation of the regulatory procedures under the 1972 act, as well as the demands of the Freedom of

Information Act, required that EPA develop a policy concerning confidential treatment of data in its files. In March 1976, EPA determined that no test data are entitled to confidential treatment (as trade secrets or otherwise) under Section 10(b) of FIFRA except to the extent that they disclosed confidential formulae, manufacturing or quality control information, or information in a registration application not yet approved by the Administrator. Acting pursuant to that policy, EPA sent notices of determination to registrants such as Chevron, identifying test data in EPA's files which it intended to disclose to the public. Although the notice gives the recipient the opportunity to demonstrate to EPA that some of the listed information may be entitled to confidential treatment, it also advises that no test data as such will be treated as confidential.

The test data generally were submitted by Chevron to meet the required showing that a particular pesticide is safe and effective when used as directed and will not cause unreasonable adverse effects on public health or the environment.[1] They fall into two major categories: (1) data relating to efficacy, and (2) data relating to hazards. Efficacy tests relate to performance of the product, usually based on comparisons of results achieved under controlled conditions. Hazard tests relate to toxicity and deal with effects on laboratory animals, chemical analyses to determine the presence of harmful residues, and impact on the environment.

EPA makes a distinction between test data, on one hand, and confidential formulae, manufacturing and quality control information, and information in a registration application which has not yet been approved, on the other hand. The latter kinds of information will be treated as confidential, even if contained in test data.

Test data are of interest to other firms desiring to register competing products and could be used by them in support of their applications. While firms using test data produced by another firm might be required under Section 3(c)(1)(D) of the act to compensate that firm if the data are used to support an EPA application, firms would be able to use the data, once they are released, for applications filed in foreign countries without paying compensation.

Test data are also of interest to members of the public and of the scientific community interested in the efficacy and safety of pesticides and their effect on the environment.

Although safety test methodology may generally be standardized, this may not be true of efficacy and residue tests. The design and methodology developed for such tests may constitute proprietary information. In addition test data may disclose commercial, marketing and research information about a product or a company helpful to competitors.

The development of test data, moreover, is time-consuming and increasingly costly. Many potential manufacturers lack the resources and expertise to conduct the necessary tests which Chevron has conducted. Making all test data available to other firms would facilitate their access to the market and would deprive firms such as Chevron of a significant competitive advantage. In the case of foreign markets, in particular, competing manufacturers would be able to sell products without incurring research costs such as Chevron has incurred. Chevron, therefore, keeps the test data it submits to the EPA confidential within the company.

Accordingly, Chevron contends in these actions that test data submitted by it to the EPA for the most part represent a substantial investment, are not known or available to competing manufacturers, and give Chevron a significant competitive advantage, and are therefore entitled to protection against disclosure as trade secrets. Inasmuch as the Administrator has declined to make a determination whether in his judgment particular test data are entitled to trade secret protection, Chevron asks this

1. *See*, 40 C.F.R. Part 162, particularly Secs. 162.2(g) and 162.8(a)(3).

Court to determine whether the data proposed to be released by the EPA are trade secrets.

Defendant has moved for summary judgment, contending that Section 10 of the act authorizes him to determine: (1) that only confidential formulae, manufacturing and quality control information, and information in registration applications not yet approved should be barred from public disclosure, and (2) that test data are otherwise subject to disclosure.

### The Statutory Framework

The disposition of this controversy is controlled by three sections of the act.

■ Section 10 deals with the protection of trade secrets. It provides in relevant part:

(a) *In general.*—In submitting data required by this subchapter, the applicant may (1) clearly mark any portions thereof which in his opinion are trade secrets or commercial or financial information and (2) submit such marked material separately from other material required to be submitted under this subchapter.

(b) *Disclosure.*—Notwithstanding any other provision of this subchapter, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this subchapter, information relating to formulas of products acquired by authorization of this subchapter may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator.

Section 10(a) contemplates that whenever data are submitted in response to any requirement of the act, *any* portions thereof may be marked by the applicant as being, in his opinion, a trade secret. This section, therefore, does not by its terms exclude test data from protection as a trade secret, if the data otherwise qualify. Section 10(b)

tends to reinforce this conclusion by prohibiting publication of what the Administrator finds to be trade secrets "*notwithstanding any other provision of [the act].*"

Defendant points to two other provisions of the act as barring trade secret protection for test data. First, Section 3(c)(1) establishes the procedure for making application for registration of pesticides. It provides in relevant part:

(c) *Procedure for registration.*—

(1) *Statement required.*—Each applicant for registration of a pesticide shall file with the Administrator a statement which includes—

\*    \*    \*    \*    \*    \*

(D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 136h(b) of this title. (7 U.S.C. § 136a(c)(1))

This section requires the submission of test data in support of a registration application and permits the Administrator to consider test data submitted by one applicant in support of another's application if the latter offers to pay reasonable compensation for the test data. It also provides, however, that such test data may be considered only if it is not protected from disclosure by Section 136h(b) (Section 10(b)). Thus, this language also indicates that Congress considered test data to be eligible for trade secret protection.

Second, the Administrator relies on Section 3(c)(2) which follows immediately after the registration provisions quoted above. That section states:

*Data in support of registration.*—The Administrator shall publish guidelines

specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time. If thereafter he requires any additional kind of information he shall permit sufficient time for applicants to obtain such additional information. Except as provided by subsection (c)(1)(D) of this section and section 136h of this title, within 30 days after the Administrator registers a pesticide under this subchapter he shall make available to the public the data called for in the registration statement together with such other scientific information as he deems relevant to his decision. (7 U.S.C. § 136a(c)(2))

This section authorizes the Administrator to determine what information must be submitted in support of a registration application and directs him to make public the data submitted in support of applications, "*except as provided in subsection (c)(1)(D) . . . and section 136h . . . .*" It is not disputed that the data required to be published by this subsection include test data submitted pursuant to Section 3(c)(1)(D). The specific exemption from mandatory publication on the basis of the provisions of Sections 3(c)(1)(D) and 10 can only refer to the protection accorded trade secrets by the act. Hence, Congress again demonstrated that it contemplated that test data would be eligible for trade secret protection.

Defendant argues, however, that Section 10(b) must be read in the context of Sections 3(c)(1)(D) and 3(c)(2). Thus, he contends that for the so-called compulsory licensing provisions of Section 3(c)(1)(D) to be meaningful, they must extend even to those test data which may be treated by the manufacturer as proprietary information affording him a competitive advantage.

Test data which are not of sufficient value and confidentiality to qualify as trade secrets are not likely to warrant compulsory licensing.[2] Defendant further contends that to make the public disclosure required by Section 3(c)(2) meaningful, the public and the scientific community should have access to test data, particularly toxicity and residue data illuminating the degree of hazard posed by particular pesticides.

■ Chevron, on the other hand, contends that the act is plain on its face, that it extends trade secret protection by its terms to any information submitted by a manufacturer in support of an application, clearly including test data, and that there is no warrant for a blanket exclusion of test data from the protection afforded by Section 10.

Whether the literal interpretation urged by Chevron conflicts with the intent of Congress requires examination of the legislative history of the act.

### The Legislative History

A review and analysis of the legislative history of the act is set forth in the appendix to this opinion. It shows that Congress meant to do more than what defendant claims it intended, *i. e.,* to provide consumers and competing pesticide manufacturers access to scientific data. The legislation as finally adopted reflected a compromise on numerous controversial issues, of which confidentiality was only one, reached after lengthy debate and consideration.

On the issue of confidentiality, the House of Representatives took the position that test data should not be disclosed by EPA if they were found to be trade secrets and that the Administrator should not be permitted to use test data submitted by one manufacturer in support of another's application for registration.

**2.** Defendant's argument seems to assume that test data which are costly to produce would necessarily be found to be trade secrets. Whether this is in fact true cannot be determined until the Administrator considers the trade secret claims in accordance with Section 10(b). It may well be that some costly and time-consuming tests and the resulting data would not qualify for confidential treatment. In that case, the Congressional purpose of saving the cost of duplicative testing could still be served by compulsory licensing of such test data without depriving other data of trade secret protection. (See, Appendix, pp. 1037–1038.)

In the Senate, a deep division of opinion on this issue existed between the Committee on Agriculture and Forestry and the Committee on Commerce. The compromise bill approved by these committees and voted on by the Senate would have permitted the Administrator to consider any test data in support of an application upon payment of compensation to the producer, would have required liberal disclosure of test data and other information by the Administrator, and would have withheld trade secret protection from data necessary to protect the public health.

The bill as it was approved by the House-Senate conference and finally enacted into law deleted the liberal disclosure provisions for trade secrets and other confidential information. It gave the Administrator authority to consider test data submitted by one manufacturer in support of another's application but added not only a provision for payment of compensation but a specific exclusion of trade secret data. Similarly, it excluded trade secrets from public disclosure, and it deleted the public health exception from the trade secret protection provision.

This history compels the conclusion that in the course of reaching a compromise on the many differences between the House and Senate bills, the House position on the confidentiality issue largely prevailed. With the exception of mandatory licensing, the conference restored and strengthened the confidentiality provisions of the House bill. The statutory language must therefore be read as reflecting an intention to protect against disclosure test data which the Administrator determines to contain or relate to trade secrets. Inasmuch as the Administrator's contention that the licensing and disclosure provisions override the confidentiality provision is not supported by the legislative history, the Court concludes that the literal interpretation of the act urged by Chevron must be adopted. *See, The Dow Chemical Company v. Costle* (No. 76–10087, E.D.Mich., N.Div., Nov. 16, 1977). Accordingly, defendant's motion for summary judgment must be denied.

## The Scope of Judicial Review

Denial of defendant's motion for summary judgment does not end the matter for the question remains whether, even if the Administrator's interpretation of the act is erroneous, this Court can grant Chevron the relief it seeks in these actions. Both parties have addressed this issue in their memoranda, and there being no triable issue of fact, it is appropriate for the Court to decide it at this point in the litigation.

The relief Chevron seeks is for this Court to review all of the test data proposed to be disclosed by the Administrator and determine which are protected from disclosure as trade secrets. The Administrator, on the other hand, asks the Court to remand the actions to the agency if summary judgment is denied.

Section 10(c) provides that if the Administrator proposes to release data which a registrant believes to be protected, the registrant "may institute an action in an appropriate district court for a declaratory judgment as to whether such information is subject to protection under subsection (b) . . . ." At first blush, this language suggests that the Court may determine whether particular information proposed to be disclosed constitutes a trade secret. It has long been held, however, that although declaratory relief may be available against an administrative agency, it "will not be used to preempt and prejudge issues that are committed for initial decision to an administrative body . . . ." *Public Serv. Comm. v. Wycoff Co.,* 344 U.S. 237, 246, 73 S.Ct. 236, 241, 97 L.Ed. 291 (1952). In *Chrysler Corp. v. Schlesinger,* 565 F.2d 1172 (3rd Cir. 1977), the court held in an action seeking to prevent disclosure by the Defense Department under the Freedom of Information Act:

"To construe the Declaratory Judgment Act to permit a federal court to conduct a trial *de novo* in reverse FOIA cases would transfer primary decisional responsibility for agency disclosures from the administrative agencies to the federal courts. We think the construction which Con-

gress intended is that the scope of judicial review provisions of the Administrative Procedure Act apply in declaratory judgment actions." (565 F.2d 1191.)

██ This reasoning is applicable to the instant cases. Were this Court to make the determinations Chevron asks it to make, it would preempt the function Congress assigned to the Administrator, *i. e.,* to determine whether in his judgment information proposed to be published contains or relates to trade secrets.

██ *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), defines the scope of review applicable to cases such as the instant cases. In that case, the Secretary of Transportation had authorized federal funding for a highway through a public park without having formally determined, as required by the Department of Transportation Act, that no "feasible and prudent alternative" route existed and that there had been "all possible planning to minimize harm." The Court held that the Secretary's action was subject to judicial review and that Section 706 of the Administrative Procedure Act (5 U.S.C. § 706) governed the scope of review. It then proceeded to analyze the six standards of review under that section and concluded that: (1) the substantial evidence test did not apply because the agency action was not taken pursuant to a rule making procedure or a public adjudicatory hearing, and (2) the *de novo* review standard did not apply because neither was the action adjudicatory and the agency's fact finding procedures inadequate nor were new issues raised in a judicial proceeding brought to enforce nonadjudicatory agency action. The Court stated that the procedure for the reviewing court to follow was to determine, first, whether the agency acted within the scope of its authority and, second, whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (5 U.S.C. § 706(2)(A).) In connection with the second question, the court must consider whether the agency decision was based on consideration of the relevant factors, without, however, substituting its judgment for that of the agency. The third step in the procedure requires the court to determine whether the agency's action followed the necessary procedural requirements. In the absence of rule making or adjudicatory proceedings, or of an express statutory requirement, no formal findings need be made by the agency. As explained in the later decision in *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), judicial review in cases of informal agency action is properly based on the administrative record made before the agency. If that record supports the agency's action, tested in the light of the standards set forth above, procedural requirements have been met and the judicial function ends. If the record does not permit the Court to find that the agency's action conforms to these standards, the matter must be remanded to the agency.

Inasmuch as the Administrator's action was neither rule making nor adjudicatory, and the act does not require formal findings, *Overton* and *Camp* control here. The proper inquiry for this Court is therefore whether, based on the administrative record:

> (1) The Administrator acted within the scope of his authority; and
>
> (2) The Administrator's action was based on the relevant factors and hence not arbitrary, capricious, or an abuse of discretion.

*See, also, Chrysler Corp. v. Schlesinger,* above, 565 F.2d at 1192.

### The Administrative Record

The agency's action in this case, which presumably is typical of the action it is taking with respect to test data generally, consisted of the mailing of a "notice of determination under Section 10(b)." The notice refers to an attached memorandum of EPA's general counsel and states that no test data are entitled to confidential treatment unless they also contain information which would reveal confidential formulae, manufacturing or quality control methods

or data in support of registration applications not yet approved.

The general counsel's memorandum which EPA appears to have adopted as the basis for its action rests on two grounds:

(1) As a matter of statutory interpretation, the provisions of Sections 3(c)(1)(D) and 3(c)(2) compel exclusion of test data from the scope of Section 10(b); and

(2) There is a lack of likelihood that substantial competitive harm would result from disclosure of test data.

As discussed above, this Court's view is that the interpretation adopted by the general counsel, which is the basis for the Administrator's motion for summary judgment, is erroneous. Accordingly, the agency's action directed at Chevron, to the extent it is based on statutory interpretation, cannot stand.

With respect to the second ground for the action, the general counsel's memorandum states that test data:

".   .   .   are precisely the data which would be of use to another firm in the latter's application for   .   .   .   registration   .   .   . .

"The principal value of the data is its usefulness in allowing others to obtain FIFRA registration of competing products   .   .   . ." (pp. 8–9)

Thus, the memorandum recognizes that release of test data would provide competitors with a valuable advantage. It concludes, however, that Congress intended to give competitors the benefit of these data to avoid duplicative testing and facilitate their access to the market. And it rejects the claim of competitive harm to the producer of the data on the theory that "Congress has provided a scheme to protect data originators against this form of competitive harm, in the compensation-for-use requirement of § 3(c)(1)(D)." (p. 9)

Section 3(c)(1)(D) requires another applicant to pay "reasonable compensation for producing the test data to be relied upon .   .   . ." The legislative history establishes that Congress intended only that a registrant pay "a reasonable share of the cost of producing the data   .   .   . ." (See, Appendix, pp. 1037–1038). The language of the act cannot be read as permitting any other result and if (as seems highly unlikely) the Administrator were in fact to require applicants to compensate producers of test data for the competitive injury flowing from their disclosure, the costs would be so high as to substantially nullify Section 3(c)(1)(D).[3]

The general counsel's memorandum also rejects claims that disclosure of test data will cause the producer substantial harm in foreign markets where they may be used to secure registration and by disclosure of proprietary information concerning research. Chevron's declaration indicates that these may be substantial claims. The memorandum rejects them summarily without apparent consideration of any facts.

■ The consideration given these matters in the general counsel's memorandum cannot be regarded as an exercise by the Administrator of his judgment whether information proposed to be released contains or relates to trade secrets, as required by Section 10(b). While the act contains no definition of trade secret, the legislative history indicates that, in adopting these protective provisions, Congress was concerned with the factors which are normally considered in common law trade secret determinations:

(1) The cost of developing the data;

(2) The value of the data to the owner and to competitors, i. e., the extent of the competitive advantage they provide;

(3) The extent to which the data are not independently known or available to others; and

(4) The extent to which the owner has maintained their confidentiality. (*See, e.*

---

**3.** Chevron's showing in opposition to the motion indicates that it considers its test data for the most part to have great value and their release to result in serious competitive disadvantage and injury, particularly in foreign markets. (See, Declaration of L. R. Stelzer.)

g., Restatement of the Law, Torts, Sec. 757.) [4]

It seems clear that Section 10 requires the Administrator to consider these factors in exercising his judgment. That is not to say that he is limited to those factors; the various policies underlying the act, such as the promotion of research, the interest in competition, the protection of public health and the environment, and the improvement of pesticides, as well as other governmental interests, may all be relevant factors. *See, National Parks and Conservation Association v. Morton*, 162 U.S.App.D.C. 223, 498 F.2d 765 (1974).

In failing to apply these factors to the Chevron data proposed to be released although claimed to contain trade secrets, the Administrator has failed to exercise his judgment.[5] He suggests that a line by line, item by item examination of test data for trade secret determination would be unmanageable in view of the massive volume of materials involved. Administrative impracticality does not, however, justify disregard of the law. Procedures such as rule making may have to be developed to afford adequate consideration of trade secret claims while conserving administrative resources.[6]

■ For these reasons, the Court concludes that the Administrator, in determining Section 10(b) to be inapplicable to all test data, has acted in excess of his authority, that the determination that test data did not otherwise warrant trade secret protection was arbitrary and capricious and not based on the relevant factors, and that the administrative record therefore does not support the Administrator's action. The matter must accordingly be remanded to the agency. *See, The Dow Chemical Company v. Costle*, above.

### Other Contentions

Chevron also contends that disclosure of trade secret information would violate the Freedom of Information Act (5 U.S.C. § 552), the Trade Secrets Act (18 U.S.C. § 1905), and the due process clause of the Fifth Amendment. In view of the disposition of this case, it is unnecessary to reach these claims. The Court notes, however, that the prevailing view among the circuits which have considered the issue is that the FOIA exemptions are permissive and do not mandate agency withholding of information. *See, Chrysler Corp. v. Schlesinger*, above, 565 F.2d 1186–1190. Section 1905 makes disclosures unlawful only if not authorized by law and may not afford affirmative relief against disclosure. *See, Chrysler Corp. v. Schlesinger*, above, 565 F.2d 1186–1188. Finally, the record is too sparse and the timing premature for the Court to consider any procedural or substantive due process claim.

### Conclusion

For the reasons stated, the motion for summary judgment must be denied. Judg-

---

4. According to the Restatement, Section 757, comment (b):

   "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."

5. The notices of determination sent by the Administrator invite Chevron to make a proper showing that information contained in the records to be disclosed may be entitled to confidential treatment but limits that showing to formulae, manufacturing or quality control methods, or data in support of applications not yet approved. The notice therefore clearly rejects in advance any effort by Chevron to make a showing before the agency that any of its test data are entitled to confidential treatment.

6. Test data may be susceptible to classification into categories with respect to which valid judgments concerning trade secret status could be made in the light of the relevant factors without line by line examination.

   Moreover, it is not clear to the Court that a distinction may not be drawn in their administration between Section 3(c)(1)(D) and Section 3(c)(2). Test data may be entitled to trade secret protection when first submitted, yet may at a later time, when considered in support of another application, no longer warrant the same degree of protection as a result of developments in the state of the art. Moreover, Section 3(c)(2) may be satisfied by publication of summaries which would omit sensitive data.

ment will be entered: (1) declaring that Section 10(b) of the act prohibits the Administrator from making public any test data submitted by Chevron and marked by it as containing or relating to trade secrets or confidential information unless the Administrator has first determined that in his judgment it does not contain or relate to trade secrets or commercial or financial information, and (2) remanding the matter to the EPA for proceedings consistent with this opinion.

IT IS SO ORDERED.

## APPENDIX

*Legislative History of Sections 3(c)(1)(D), 3(c)(2) and 10 of the Federal Environmental Pesticide Control Act of 1972*

The bill which became the Federal Environmental Pesticide Control Act of 1972 was originally introduced in the House of Representatives as H.R. 10729. It was referred to the Committee on Agriculture which issued its report on September 25, 1971. (H.R.Rep.No.92–511, 92d Cong. 1st Sess. (1971).) The House Report reviewed the role of pesticides in American agriculture and the history of pesticide regulation, and discussed the need for new legislation. It described the purpose of the 1972 legislation to be to balance the varied needs of farmers, manufacturers, environmentalists and consumers, and stated in relevant part:

"The machinery for managing these chemical compounds which are being introduced daily into the environment needs updating to properly balance all of the many factors interrelated with our current management of pesticides.

"The Committee acknowledges that the wise use of pesticides has saved millions of lives by controlling insect vectors of diseases such as malaria and typhus, and the Nation as a whole has benefited tremendously from the efficiency of insect and weed control made possible by agricultural applications of pesticides of various sorts.

"But on the other hand, there is evidence of diminished effectiveness of con-

trol and increased undesirable effects on non-target and beneficial organisms resulting from indiscriminate use and abuse of invaluable pesticides.

"The Committee found the greatest need for revision of existing law to be in the areas of strengthening regulatory controls on the uses and users of pesticides, speeding up procedures for barring pesticides found to be undesirable; streamlining procedures for making valuable new control measures, procedures, and materials broadly available; strengthening enforcement procedures to protect against misuse of these biologically effective materials; *and creating an administrative and legal framework under which continued research can produce more knowledge about better ways to use existing pesticides as well as developing alternative materials and methods of pest control.*" (*Id.* 4, emphasis added.)

The report went on to state that under H.R.10729, "old FIFRA is changed from a labeling to a regulatory program. New tools for restricting the introduction and dissemination of pesticides into the environment are given to the EPA. *Continued and expanded research, both private and public, is encouraged.*" (*Id.* 4, emphasis added.)

The House Report listed a number of factors relating to the construction and intent of the bill including the following:

"9. Research

There has existed for years collaborative research between manufacturers of pesticides and public and private research institutions. However, initial experimental formulations have largely originated in the laboratories of the manufacturers. *The Committee believes this vital research base to be extremely important in the development of new and better materials to meet the environmental and productive needs of the future. This objective is also sought in this legislation.*" (*Id.* 16, emphasis added.)

Section 3(c)(1)(D) of H.R.10729 was intended to respond to demands that the Environmental Protection Agency should be given increased authority to require manu-

facturers to submit test data—regarded as necessary by it concerning the safety and efficacy of pesticides sought to be registered. To protect manufacturers against competitive harm which would result from disclosure of information not previously required to be submitted, this section also stated that such data:

".  .  . shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration." (*Id.* 50.)

Thus the addition of the exclusive use provision appears to have been intended to balance the broadened requirement for the submission of test data requested by EPA.

Section 3(c)(2) contained the same language as is found in the section as finally enacted. In relevant part it stated that: "Except as provided by subsection (c)(1)(D) of this section and section 10, within 30 days after the Administrator registers a pesticide .  .  . he shall make available to the public the data called for in the registration statement together with such other scientific information as he deems relevant to his decision." (*Id.* 50.)

Section 10 contained only subsections (a) and (b) which were in the form in which they appear in the present law; subsection (c) had not yet appeared. (*Id.* 57, *see also* 20, 24.)

From the House Committee Report, it may be concluded that the House bill was intended, among other things, to encourage pesticide research by private industry and to accomplish this purpose by protecting proprietary information, including test data. The cross reference in the public disclosure provision (Sec. 3(c)(2)) to the exclusive use of test data provision (Sec. 3(c)(1)(D)) and the trade secret provision (Sec. 10) could only have been intended to circumscribe public disclosure so as to protect test data regarded by an applicant as trade secret. Support for that interpretation is found also in the separate comments on the Report by two Committee members expressing concern that these provisions would severely restrict public access to information, resulting in an undue extension of patent protection. (*Id.* 69, 71–72.)

The bill came before the House, sitting in committee of the whole, and was debated on November 8 and 9, 1971. Congressman Dow from New York, a member of the Agriculture Committee and an advocate of greater disclosure by manufacturers, objected to several provisions of the bill and offered a number of amendments, one of which would have struck the exclusive use provision of Section 3(c)(1)(D). (117 Cong. Rec. H. 10677–8, H. 10733–10740.) In response, Congressman Kyl of the Committee pointed out that:

"It cost $12 to $14 million to perfect, synthesize and test any single pesticide product on the market.

"If we make it impossible or totally inadvisable in an economic sense for any manufacturer to do the research which is necessary to find the alternatives, then we have killed the goose that lays the golden egg." (*Id.* H. 10678.)

Chairman W. R. Poage of the Committee further explained that the provision regarding availability of information "was drafted with the explicit intention of preventing the original research of one company from being pirated by another company. Without such safeguard a company would be reluctant to invest hundreds of thousands or millions of dollars in research to find new and better pesticides, only to have this costly data made available to a competitive company." (*Id.* H. 10679.)

Several Congressmen argued in favor of the Dow amendments, objecting to the restriction against reliance by the Administrator on data submitted by other manufacturers. (*Id.* H. 10742.) Representative Abzug complained that the bill:

".  .  . commands the Administrator .to keep data relating to toxicity of pesticide products secret until after the decision on registration is made. It also grants the pesticide industry the right to decide what data will or will not ultimately be available, since it lets the industry decide which portion of its data is to remain secret .  .  . The bill be-

fore us would . . . bind the Administrator to shield toxicity data from the public eye on a permanent basis." (*Id.* H. 10743.)

The debate continued without response to this interpretation from any member of the Committee or supporter of the bill. At a later point, Representative Kastenmeier moved to strike the exclusive use provision, arguing that it would subvert the patent laws by extending indefinitely the right of exclusive production of a pesticide. The bill would foreclose the use of test data submitted by an applicant even after his patent had expired. Moreover, he contended, safety and efficacy data are so costly to generate that it is unlikely that subsequent applicants for registration could undertake the research effort. Accordingly, the

". . . registrant of a pesticide can effectively prevent market entry of new producers of that pesticide by simply refusing to give permission to the Administrator to use the scientific data already available in registering subsequent applications. With no time limit, this provision could very effectively operate to make the original registrant of a patentable pesticide material the only registrant." (*Id.* H. 10767.)

Congressman Kyl, one of the managers of the bill, responded:

". . . the gentleman from Wisconsin and others have tried to make something appear which does not appear, in seeking to amend this provision of the act.

"This is what the bill says in effect.

"The Government has the right to require any information it wants. All information must be given to the Government so the Government can make a decision.

"But if manufacturer 'A' asks to register a chemical and another manufacturer, manufacturer 'B', comes in and wants to register its own chemical then 'B' cannot use the information developed by the first applicant.

"The Government gets all the information it needs and the public gets all the information it needs. All the committee language does is to prevent one industry from pirating another industry's secrets. That is all it does." (*Id.* H. 10767.)

The motion was then defeated, and, after further debate, H.R. 10729 substantially as reported by the Committee was adopted by the House on November 9, 1971.

Thus, the debate in the House indicates that the policies and purposes expressed in the Committee Report were adopted by the House. Much the same arguments which underlie the defendant's position in these cases in support of the publication of test data were voiced on the floor in vigorous support of Congressman Dow's amendments but were rejected. The conclusion must be drawn that the House favored protection of investment in research over easing entry of competitors into the market and greater disclosure of test data to the public.

After passage by the House, the bill went to the Senate where it was referred to the Committee on Agriculture and Forestry. That Committee issued its report, dated June 7, 1972, recommending adoption of H.R. 10729 substantially in the form in which it was adopted by the House. (S.Rep.No.92–838, 92d Cong. 2d Sess. (1972), at 2, 6, 10, 19, 26, 47, 69, U.S.Code Cong. & Admin.News 1972, p. 3993.) The Committee declined to adopt a recommendation to permit the Administrator to refer to any applicant's test data in evaluating the adequacy of another applicant's test data, stating that:

"Giving applicants proprietary rights in their test data will encourage applicants to spend the money necessary to test their products fully and assure their safety. Requiring subsequent applicants to make their own tests will serve as a double check on the original test procedures and either provide double assurance that the products are safe or show up their short-comings." (*Id.* 6, 10, U.S.Code Cong. & Admin.News 1972, p. 3998.)

The Committee did, however, eliminate the reference to the Administrator's judgment in Section 10(b), leaving determina-

tion of what is a trade secret to the courts instead. (*Id.* 10, 69.)

The views of the Senate Committee on Agriculture and Forestry on the desirability of protecting proprietary information against disclosure therefore conformed to those of the House.

Following issuance of this report, H.R. 10729 was referred to the Senate Committee on Commerce. The Committee issued its report on July 19, 1972, recommending passage of H.R. 10729 but with major amendments adopted by the Committee. (S.Rep.No.92–970, 92d Cong. 2d Sess. (1972), U.S.Code Cong. & Admin.News 1972, p. 4092.) Those amendments, among other things, eliminated the exclusive use of test data provision in Section 3(c)(1)(D), and substantially restricted the protection to be afforded trade secrets under Section 10(b). (*Id.* 2, 3.) The Committee expressed the view that the Administrator should be permitted to use test data submitted by one manufacturer in support of another's application in order: (1) to avoid creation of barriers to entry into the market beyond those envisioned by the patent system, and (2) to prevent the diversion of research funds to the performance of duplicative tests. (*Id.* 39.)

The Agriculture Committee recorded its opposition to these amendments in its Supplemental Report. (Supplemental Report, issued October 3, 1972, to S.Rep.92–838, dated June 7, 1972, at 1, 2, 3, 12–21.) The Committee reaffirmed its position on the exclusive use provision, stating that duplicative testing could be avoided by having manufacturers share equitably in the cost of the earlier tests. (*Id.* 12.) The Committee opposed the proposed amendment to the confidentiality provisions because it would limit trade secret protection as well as re-

strict the Administrator's power to require applicants to submit additional test data. (*Id.* 34–37.) [7]

Shortly after this report was issued the staffs of the two Senate Committees held a series of meetings which resulted in a compromise bill. The provisions of the compromise were summarized in the Supplemental Report and reflect that the issue of confidentiality was one of the major areas of dispute between the two Committees. The substance of the compromise on this issue was as follows:

(1)   The exclusive use of data provision was retained but a mandatory licensing provision for test data in return for payment of a reasonable share of the cost of producing the data was added;

(2)   The provision requiring submission of test data requested by the Administrator remained;

(3)   The provision requiring the Administrator to publish data in the registration statement and other scientific information within thirty days *after* registration was deleted;

(4)   A provision requiring public disclosure of information pertaining to an application for registration not more than thirty days *before* registration was added;

(5)   Another provision requiring disclosure of communications between the Administrator and any person was added, subject, however, to the prohibition against disclosure described in the following subparagraph (6);  and

(6)   Disclosure of trade secrets, confidential financial or commercial information "the disclosure of which may give a competitor a competitive advantage" was prohibited except "to any other person in order to protect the public health." The

---

7.   Defendant refers to a statement of the National Agriculture Chemicals Association (NACA) incorporated in this report as confirming that Section 3(c)(2) as adopted by the House and endorsed by the Senate Agriculture Committee would require "that all data in support of an application which has been granted be made available for public inspection, except for certain limited exceptions." (*Id.* 19; Def. Memo., p. 13.) Defendant has overlooked the

explanatory statement which appears near the beginning of the NACA statement:

"What these related provisions [Secs. 3(c)(1)(D) and 3(c)(2)] would do and would not do may be stated concisely:

"1.   They would make available for public inspection data submitted by an applicant for registration (*except data which the Administrator considers to constitute a trade secret.*)"  (Emphasis added.)

Administrator's decision to release information would be subject to judicial review. (*Id.* 69–71.)

As part of the compromise, the staffs agreed that

"Information that constitutes a trade secret, financial information which is privileged or confidential, or commercial information, the disclosure of which gives a competitor a competitive advantage with respect to the proprietor of the information should be protected from disclosure except under those circumstances enumerated in subsection (c)(1) [presumably the mandatory licensing provision of Sec. 3(c)(1)(D)]." (*Id.* 72.)

They further agreed that "General approval is given to the definition of 'trade secret' as incorporated in the RESTATEMENT OF TORTS." (*Id.* 72.)

Finally they agreed that the legislative intent with respect to Section 3(c)(1)(D) was: (1) to authorize the Administrator to require a description of all relevant tests and results, and (2) to prevent unnecessary repetitive testing by subsequent applicants. (*Id.* 72.)

The Senate history reflects a deep division between the two Committees on the subject of confidentiality and use of data. The Agriculture Committee receded from its support of the exclusive use provision but only upon acceptance by the Commerce Committee of a provision for the payment of compensation through mandatory licensing. The compromise contained liberal provisions, not only for disclosure of supporting data *before* registration is granted, but also for disclosure of communications between the Administrator and any person. In return, the compromise acknowledged the application of the Restatement definition of trade secret to protect information giving competitive advantage, subject, however, to an exception for information needed to protect public health. The bill contained no reference to trade secret protection in the mandatory licensing provision although it did contain such a reference in Section 3(c)(2), relating to public disclosure. That provision, however, seems clearly to have been intended to bring about public disclosure of data supporting an application before the Administrator approves a registration, undoubtedly to generate public participation in the process.

The Senate compromise appears to have opted in favor of liberal disclosure. Trade secret protection for test data, although theoretically available, was greatly restricted by the exemption for information needed to protect the public health, and was not specifically provided for data subject to mandatory licensing under Section 3(c)(1)(D).

On September 26, 1972, the bill came before the Senate. (118 Cong.Rec.S. 15885 *et seq.*, Sept. 26, 1972.) The manager of the bill, Senator Allen, a member of the Agriculture Committee, gave a short explanation of the bill which included the statement that the bill would:

"... give applicants for registration proprietary rights in their test data (Section 3(c)(1)(D))." (*Id.* S. 15889.)

The general explanation given to the Senate further stated:

"Giving applicants proprietary rights in their test data will encourage applicants to spend the money necessary to test their products fully and assure their safety. Requiring subsequent applicants to make their own tests will serve as a double check on the original test procedures and either provide double assurance that the products are safe or show up their short-comings." (*Id.* S. 15890.)

In his statement to the Senate, Senator Allen further described the major provisions of the bill, stating in part:

"It would prohibit the Administrator from considering data submitted in support of one application from being considered in support of any other application for registration unless a reasonable share of the cost of producing the test data to be relied upon is paid by the second applicant. The cost of testing a product . . . may be very great. If the product is not patentable or if the patent protection has expired, there is nothing at present to prevent a competitor from registering a similar product

and establishing efficacy and safety through use of the first applicant's data." (*Id.* S. 15894.)

Senator Allen then submitted for the record the description of the compromise substitute for H.R. 10729 of the two Senate Committees, summarized at pp. 1036–1037, above. (*Id.* S. 15894–5.) Senator Nelson, in speaking in support of the compromise bill, stressed, among others, its provisions that "the test data submitted by manufacturers in support of a pesticide registration will be made available to the public 30 days before a decision to register a pesticide becomes effective" and "that test data shall be available to manufacturers who are willing to share the costs . . . ." (*Id.* S. 15897.) It is of interest that one of the newspaper articles submitted by the Senator for the record in support of the compromise states that it

". . . would require . . . [EPA] to disclose *nontrade secret information* submitted by a manufacturer before approval of a pesticide is given." (*Id.* S. 15898, emphasis added.)

Following a few more laudatory statements, and an exhortation from Senator Packwood that the Senate conferees "will hold steadfastly to the Senate version, particularly as it deals with registration criteria . . . availability of test data, and exclusive use of data", the Senate without debate adopted the bill by a vote of 71 to 0. (*Id.* S. 15899–15900.)

The Senate proceedings reflect the continuing division between those favoring proprietary protection, led by Senator Allen, and those favoring disclosure, represented by Senators Nelson and Hart. Each side sought to find in the language of the compromise support for its position. But no one seems to have come to grips with the bill's inherent contradiction (illustrated by the conflicting explanations given to the Senate) between protection of proprietary data and liberal disclosure and licensing.

On October 5, 1972, the report of the House and Senate conference was issued. (S.Rep.No.92–1540, 92d Cong. 2d Sess. (1972), U.S.Code Cong. & Admin.News 1972,

p. 4130.) The report set forth the bill in the form in which it ultimately became law, and contained a joint explanatory statement of the provisions of the compromise bill recommended by the Committee of Conference. With respect to the three provisions relevant here, it stated in substance:

(1) As to Section 3(c)(1)(D), the bill provided for mandatory licensing of test data, with the Administrator to determine reasonable compensation for use of the data. (*Id.* 31.)

(2) As to Section 10, the report referred to Section 10(d) [sic (c)] and stated only that it provided for "judicial review of the Administrator's decision to release information which the applicant or registrant believes to be protected from disclosure." (*Id.* 32.)

(3) As to Section 3(c)(2), adopted in the form originally passed by the House, the report was silent.

The report further stated:

"In addition, the conferees have deleted several substantive provisions included in the Senate amendments as follows:

\* \* \* \* \* \*

(2) Provisions calling for more liberal disclosure policies with respect to trade secrets and other confidential information.

(3) Alternative language concerning the requirement for making data available to the public." (*Id.* 34, U.S. Code Cong. & Admin.News 1972, p. 4134.)

It must be borne in mind that the exclusive use and confidentiality issues were only three of a number of controversial issues before the Conference; the report states that there were over fifty points of difference between the House and Senate bills. While there is no record of the negotiations, the results indicate that on these issues the Senate largely gave in to the House.

Although the exclusive use provision was replaced by mandatory licensing, the protection provided proprietary data under Section 3(c)(1)(D) was strengthened by addition of the cross reference to Section 10 as well as the right of judicial review of the compensation decision of the Administrator. The significant additions to the original

House bill are shown by the following comparison:

*H.R. 10729—House Version:*

(D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration;

*As finally enacted:*

(D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 10(b). If the parties cannot agree on the amount and method of payment the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator;

In view of the strong support for protecting proprietary test data first in the House Agriculture Committee and later in the Senate Agriculture Committee, and the statement in the Conference Report that "provisions calling for more liberal disclosure policies with respect to trade secrets [have been deleted]", it is difficult to find support for a position treating the reference to trade secret protection here as surplusage.

The legislative history indicates that most of the relevant concern was with the licensing provision of Section 3(c)(1)(D), permitting consideration by the Administrator of test data submitted by one applicant in support of another's application. The disclosure provisions of Section 3(c)(2) received comparatively little attention. Considering the legislative history as a whole, Congress in the end appears to have placed the interest in protecting the manufacturer's investment in research and the incentive to make it ahead of the interest in disclosure of test results. In view of the expressed concern for the protection of proprietary data and the guarded approach to making test data available for consideration by the Administrator, the Court cannot conclude that by the addition of the latter Congress meant to nullify the former.

The public disclosure provision of Section 3(c)(2) as adopted by the Conference was identical to the language of the House bill. This action represented abandonment of the sweeping disclosure provisions, including pre-approval disclosure of registration materials and disclosure of any communications with the Administrator, in the Senate bill. Coupled with the above quoted statement respecting the deletion of the "more liberal disclosure policies with respect to trade secrets," this action must be read as adoption of the House philosophy of protecting proprietary information, including particularly test data, in order to stimulate research.

The strengthening of Section 10(b) must be considered in pari materia with the foregoing provisions. Significantly, the Conference rejected the exception for information required for the public health and not only restored the original House version of that subsection but added subsection (c) which gave the registrant judicial relief against disclosure of information protected by subsection (b).

When the Conference bill came back to the Senate, the explanation of the differences between that bill and the Senate

amendments to H.R. 10729, inserted into the record, stated among other things that the "more liberal disclosure policies with respect to trade secrets and other confidential information" contained in the Senate amendment had been dropped. (S. 16978.) Remarks on the floor by Senators Hart and Nelson, the principal proponents of the more liberal disclosure provisions of the Senate amendments, reflected substantial disappointment in the conference report. (S. 16979–16980.) Senator Miller, however, observed:

"One of the most difficult areas to be negotiated here had to do with test data use in submitting an application for a certificate. I believe the protection afforded the owner of test data represents an adequate protection, and while I understand that some people who own test data do not wish to have it made available under any circumstances at all, . . a proper reimbursement approach seemed to be in order.

"What we have provided . . . has been a procedure whereby, through the use of the courts, the owner of the test data can, if he is not satisfied with the award made by the EPA, try to obtain additional amounts of money representing the just compensation due him . . .

"I think this is about the best protection that could be afforded to the owner of test data." (S. 16978–16979.)

After brief additional remarks, the Conference Report was agreed to.

When the report came before the House, it was also accompanied by a brief explanation which stated, in relevant part:

"The Administrator may not consider the test data supporting one application in support of another application without the originator's permission or unless the second applicant has first offered to pay reasonable compensation for the test data . . . .

"3. All information except trade secrets and privileged information in support of registration must be made available to the public within 30 days of the registration . . . .

"The Administrator may not make information public if it comprises trade secrets, or commercial or financial information . . . ." (H. 9796.)

Without further debate, the House adopted the Conference Report.

Thus, while the Senate floor discussion does little but confirm the abandonment of the liberal disclosure provisions advocated by some Senators, the House statement leaves no doubt that the bill permitted the Administrator to consider another registrant's test data subject to payment of compensation but precluded public disclosure of any trade secret.

In November 1975, Section 3(c)(1)(D) was amended to make the mandatory licensing provision and the reference to trade secret protection applicable to data submitted on or after January 1, 1970. (P.L. 94–140.) Although the effect of this amendment may be to permit use by the Administrator of pre-1970 data to support other applications, it does not appear to diminish the trade secret protection available to all trade secret data under Sections 3(c)(2) and 10(b). Neither of those sections limits trade secret protection to data submitted after 1969.