**UNIROYAL CHEMICAL COMPANY, INC., Plaintiff,**

v.

**DREXEL CHEMICAL COMPANY INC., Defendant.**

**No. 3:95 CV 2648 (GLG).**

United States District Court, D. Connecticut.

June 28, 1996.

**134**

Cohen and Wolf, P.C. by David B. Zabel, Stewart I. Edelstein, Bridgeport, CT, McKenna & Cuneo, L.L.P. by Kenneth W. Weinstein, Victoria A. McEneney, Larry J. Gusman, Washington, DC, for Plaintiff.

Schatz & Schatz, Ribicoff & Kotkin by Lewis G. Schwartz, Gary S. Klein, Stamford, CT, Piper & Marbury L.L.P. by Andrew L. Deutsch, Jeffrey F. Liss, New York City, for Defendant.

## OPINION

GOETTEL, District Judge:

Defendant Drexel Chemical Company, Inc. ("Drexel") moves to dismiss the complaint of plaintiff Uniroyal Chemical Company, Inc. ("Uniroyal") pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6). For the reasons state below, defendant's motion (Document # 18) is DENIED.

## BACKGROUND

Plaintiff Uniroyal is a New Jersey corporation with its principal place of business in Middlebury, Connecticut. Uniroyal is in the business of, among other things, researching, manufacturing, marketing, and selling pesticides. Defendant Drexel is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Drexel is also a manufacturer and distributor of pesticides.

Maleic Hydrazide ("MH") is a plant growth regulator developed, manufactured, and sold by Uniroyal which is used to improve yields for crops such as potatoes, onions, and tobacco. Uniroyal first obtained registration for MH in 1952. Sometime prior to 1980, Drexel purchased an MH registration from a company other than Uniroyal.

This litigation concerns Drexel's successful attempt in the United Kingdom ("U.K.") to obtain from the U.K.'s Pesticide Safety Directorate ("PSD") a pesticide registration for their MH product, "SOURCE." A brief background of Uniroyal and Drexel's United States ("U.S.") registration activities, however, is warranted.

In the 1980s, the United States Environmental Protection Agency ("EPA") began an effort to reexamine and recertify the safety of MH pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). To aid the registration of MH, Uniroyal alone commissioned, paid for, and submitted to the EPA three studies: a "Lifetime Oncogenicity Study in Mice," a "Two-generation Reproduction Study with Rats, and a "Teratology Study in Rabbits with Potassium Salt of Maleic Hydrazide" (collectively, the "Chronic Studies"). Uniroyal paid testing laboratories over $500,000 to conduct these studies and it is the sole owner of them.

After the EPA evaluated Uniroyal's Chronic Studies, it determined that a number of different, additional studies also would be required to support the reregistration of MH. After receiving notice of these additional requirements, the three companies that were registrants of MH pesticides in 1988—Uniroyal, Drexel and Fair Products, Inc. ("Fair Products")—began negotiations for the purpose of reaching an agreement to jointly develop the new MH studies. Uni-

royal, Drexel and Fair Products agreed to a Memorandum of Understanding ("MOU") under which the "MH Task Force" was organized. The MOU provided that the task force would jointly develop the required data.

Drexel and Uniroyal agree that, under the MOU, each participant acquired joint ownership rights in the data the task force developed. Their disagreement, however, and the main factual issue presented in this litigation, is whether the Chronic Studies were subject to this joint ownership sharing agreement. Uniroyal argues that the MOU granted joint ownership rights only in data subsequently developed by the task force. Drexel disagrees, arguing that the MOU granted each participant ownership rights in both the task force data and the Chronic Studies—all of the data submitted to the EPA in support of the reregistration of MH.

In 1982, before the Chronic Studies were submitted by Uniroyal to the EPA, Uniroyal obtained from the PSD a registration to sell MH in the U.K. Sometime thereafter, Uniroyal submitted to the PSD the Chronic Studies. In 1991, Drexel[1] submitted an application to the PSD for registration of its MH product, SOURCE. The PSD later informed Drexel that it could not accept its application unless Drexel submitted certain scientific data. Several years of correspondence took place between the PSD and Drexel concerning this and other data requirements.

Drexel attempted to satisfy one of the PSD's requirements by citing one of the Chronic Studies. Initially, the lower-level employees of the PSD were resistant to Drexel's reliance on these studies, stating "[w]here third party data are used in support of a submission, PSD must be absolutely sure that the appropriate authority exists to access all necessary data" and that PSD was not completely certain of Drexel's rights of access to the Chronic Studies. Through later correspondence, Drexel was successful in convincing the PSD that it did have valid rights in the Chronic Studies, and on or about March 17, 1995, the PSD provisionally approved Drexel's MH pesticide.

It was only after the PSD's decision was officially published in the U.K. Pesticide Register on April 4, 1995 that Uniroyal became aware of Drexel's attempts to register SOURCE in the U.K. Uniroyal subsequently sought assurances from the PSD that Drexel had not relied upon data that Uniroyal had submitted in support of its own registrations. The PSD informed Uniroyal that it had relied on the Chronic Studies pursuant to Drexel's assurances that Drexel had the legal right to access this data. Following additional correspondence in which Uniroyal protested Drexel's legal right to rely on the Chronic Studies, the PSD wrote a September 11, 1995 letter to Uniroyal's English solicitors stating in relevant part:

> As I have explained previously, PSD takes the issue of data ownership extremely seriously and devote considerable time and effort to ensuring that established rights are respected. However, it is not our policy to seek to establish those rights in the first place.... We accept the veracity of statements and claims made by applicants and the validity of supporting data, unless there are good grounds for doubt. In the present circumstances, we have no reason to doubt the information given to us by Drexel/Chiltern at the time of the application for approval of Source. If we were now to be presented with convincing evidence that in fact the information and assurances given to us were misleading we would, of course, reconsider the approval. But since you and Drexel/Chiltern have unresolved competing claims in respect of the MH Task Force data, any such evidence is unlikely to be forthcoming unless and until the difference of opinion is resolved in your client's favour.

In this litigation, Uniroyal seeks to resolve the competing claims to the Chronic Studies in its favor. It seeks a declaratory judgment declaring that Drexel has no ownership rights in the Chronic Studies. In addition, Uniroyal now seeks compensatory and puni-

---

1. Chiltern Farm Chemicals, Ltd. ("Chiltern") acts as a distributor of Drexel products in the U.K., and acted on Drexel's behalf in registering for Drexel pesticides with the PSD. For the purposes of this decision, we do not distinguish between Drexel's and Chiltern's actions.

tive damages based on Drexel's alleged fraudulent misrepresentations to the PSD that it had the right to rely on the Chronic Studies. Uniroyal seeks the profits Drexel has received from the sale of SOURCE because of such misrepresentations, Uniroyal's lost profits because of Drexel's successful registration, and all costs, expenses and reasonable attorney's fees relating to this litigation.

Drexel now moves to dismiss the complaint for various reasons.

## DISCUSSION

### I. *Personal Jurisdiction*

Drexel first argues that the complaint must be dismissed because it is not subject to personal jurisdiction under any part of Connecticut's long arm statute. Drexel further argues that the assertion of such jurisdiction would violate due process.

Uniroyal responds that there is personal jurisdiction under Conn.Gen.Stat. § 33–411(c)(1), which subjects foreign corporations to suit on any cause of action arising "out of any contract ... to be performed in this state...." Uniroyal argues that the MOU established a joint venture, and that its causes of action arise out of that contractual joint venture.

■ In order to satisfy its burden of proof at this juncture, "the plaintiff need only show a prima facie case of jurisdiction, such showing being sufficient regardless of any controverting presentation by the party moving to dismiss." *Pomazi v. Health Industries of America, Inc.*, 869 F.Supp. 102, 104 (D.Conn. 1994) (citation omitted). Prior to discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed.R.Civ.P. 11, legally sufficient allegations of jurisdiction. At [this] preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990) (emphasis in original).

■ All Uniroyal's "allegations of jurisdictional facts are presumed true and all factual disputes are decided in its favor." 2A James

Wm. Moore, *Moore's Federal Practice,* ¶ 12.07[2.–2], p. 12–72 (2d ed. 1995). Therefore, the first legal issue to be decided is whether Uniroyal's causes of action arise out of the MOU. If they do, then Uniroyal has satisfied its burden of establishing a prima facie case of jurisdiction.

Drexel argues that Uniroyal's causes of action do not arise out of the MOU, but instead arise out of the alleged misrepresentations that occurred in the U.K. In support of this position, Drexel cites *Golden Gulf Corp. v. Jordache Enterprises, Inc.*, No. 91 Civ. 8506 (LAP), 1994 WL 62384 (S.D.N.Y. Feb. 24, 1994). In that case, the court addressed whether plaintiff's causes of action arose out of a licensing agreement. The court stated, "[t]he elements of the causes of action asserted against [defendant] are not dependent on the existence of the Agreement, but on the representations made by [defendant]." *Id.* at *5. In contrast, here Uniroyal's causes of action *are* dependent on the existence of the MOU's coverage of the Chronic Studies.

■ Although Uniroyal asserts several claims, their central claim is essentially a breach of contract claim. Uniroyal alleges that Drexel has made false claims of rights existing under the MOU. These claims of rights arise out of the MOU, and we therefore find that Uniroyal's causes of action sufficiently arise out of a contract to be performed in Connecticut to satisfy Conn.Gen. Stat. § 33–411(c)(1).

■ We further hold that the assertion of such jurisdiction complies with the Due Process Clause of the Constitution. First, we hold that by participating in the MH Task Force, Drexel established the "minimum contacts" with Connecticut such that it "should reasonably anticipate being haled into court there" for controversies arising out of the MOU. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted). Second, we find that the assertion of such jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326

U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

## II. *Live Controversy between the Parties*

■ Drexel argues that Count I of the complaint, seeking a declaratory judgment, should be dismissed because "the only dispute that ever existed between Drexel and Uniroyal—whether the PSD was entitled to consider Uniroyal data in connection with Drexel's application for SOURCE—has been fully resolved by the PSD's rejection of Uniroyal's petition to revoke the approval of SOURCE." Drexel's memorandum of law, p. 27–28. Because of this, Drexel argues there is no actual case or controversy permitting the exercise of declaratory judgment jurisdiction. *See Obeda v. Connecticut Board of Registration for Professional Engineers and Land Surveyors,* 570 F.Supp. 1007, 1016 (D.Conn.1983). As Drexel notes, we may not issue a declaratory judgment unless the facts alleged "show that there is substantial controversy between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ We disagree with Drexel's framing of the dispute, and find there is an ongoing controversy that remains to be decided: whether or not the MOU gives Drexel any rights in the Chronic Studies. The PSD explicitly refused to resolve this issue and stated that it would reconsider Drexel's SOURCE approval if it were presented with convincing evidence that the information and assurances given to it by Drexel were misleading. We therefore find that Count I presents an actual live controversy appropriate for resolution under the Declaratory Judgment Act.[2]

## III. *Act of State Doctrine and Comity*

Drexel argues that the principles of the act of state doctrine and of comity compel the dismissal of Uniroyal's complaint. Drexel argues that for Uniroyal to prevail in this action, we must find that the PSD violated its own data protection regulations in denying Uniroyal's petition to revoke the approval of SOURCE. Drexel further argues that any decision would disregard and invalidate the PSD's decision that Drexel had complied with their regulations.

■ A decision on Count I of Uniroyal's complaint would not so interfere with the PSD's authority or decision-making powers. In Count I, Uniroyal merely seeks a declaratory judgment that Drexel has no ownership rights in the Chronic Studies. We agree with Uniroyal that this issue concerns the scope of a contract executed in the U.S., by U.S. corporations for the purpose of satisfying U.S. regulatory requirements. Count I thus raises an issue exclusively of U.S. law, having nothing to do with foreign affairs. We therefore reject Drexel's argument as to Count I.

We need not presently address whether the relief requested by Uniroyal in Counts II through V, including confiscation of the profits earned by Drexel from the sales of SOURCE in the U.K., would be barred by the act of state doctrine or by comity. These damages issues may be appropriately decided following a determination of liability.

## IV. *Uniroyal's Property Interest in the Chronic Studies*

Drexel next argues that it did not violate Uniroyal's property interests in the Chronic Studies because Uniroyal has no such property interests. Drexel asserts that by disclosing the Chronic Studies to the EPA, Uniroyal lost all state law property rights in the Chronic Studies. Accordingly, Uniroyal's only remaining rights to the studies are governed by FIFRA, which does not protect Uniroyal from Drexel's use of their studies abroad. Because Uniroyal's property rights were not infringed, Drexel argues that Uniroyal's claims fail to state valid causes of action.

Drexel's argument is premised on their assertion that once Uniroyal submitted the

---

**2.** Drexel further argues that Uniroyal's claims for damages are premature. We need not address this issue at the present time.

Chronic Studies to the EPA, it abandoned any state law property interest in that data. Drexel cites *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), and *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), in support of this position.

In *Ruckelshaus,* the Supreme Court addressed the constitutionality of FIFRA's data consideration and disclosure policies. Under FIFRA § 10(d), 7 U.S.C. § 136h(d), as amended in 1978, the EPA may disclose health, safety, and environmental data to qualified requesters. Additionally, under FIFRA § 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D), data submitted in support of a registration may be considered in support of another application for 15 years after the original submission if the applicant offers to compensate the original submitter. Section 3(c)(1)(D)(ii) provides that if the parties cannot agree on the amount of compensation, either may initiate a binding arbitration proceeding. The results of this arbitration proceeding are not subject to judicial review, absent fraud or misrepresentation. The plaintiff in *Ruckelshaus,* an investor, producer, and seller of pesticides, brought suit for injunctive and declaratory relief, alleging that the data-consideration and data-disclosure provisions of FIFRA effected a "taking" of property without just compensation, and that the data-consideration provisions effected a taking of property for a private, rather than public, purpose.

The Court first determined that the plaintiff had a property interest in the health, safety, and environmental data it submitted to the EPA. 467 U.S. at 1003–04, 104 S.Ct. at 2873–74. The Court then found that the EPA's use of a submitter's data to evaluate a later application, or disclosure of that data to the public, could not be a taking if such use and disclosure did not interfere with a "reasonable investment-backed expectation." *Id.* at 1005, 104 S.Ct. at 2874. As to data submitted to the EPA after the effective date of the 1978 FIFRA amendments, the Court held that plaintiff "could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself." *Id.* at 1006, 104 S.Ct. at 2874. The Court therefore concluded that the plaintiff did not have a reasonable investment-backed expectation that the EPA would not use or disclose the data in a manner that was authorized by law at the time of that submission. *Id.* at 1006–07, 104 S.Ct. at 2874–75. Because there was no such expectation, no taking occurred.

The Supreme Court entertained a related issue the next year in *Thomas v. Union Carbide, supra.* The issue was whether FIFRA violated Article III of the Constitution by providing that compensation to be paid to an original data submitter for later use of its EPA data was to be determined by binding arbitration with limited judicial review. Plaintiff in that case argued that by allocating to arbitrators functions of judicial officers, FIFRA violated Article III's mandate that the judicial power of the United States be vested in courts whose judges enjoy tenure during good behavior and compensation that shall not be diminished during their continuance in office. The Court disagreed, and found the arbitration provision constitutional.

The Court first noted that *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84, 102 S.Ct. 2858, 2878, 73 L.Ed.2d 598 (1982), established that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review. 473 U.S. at 584, 105 S.Ct. at 3334–35. The Court then addressed plaintiff's argument that their claims to compensation under FIFRA are a matter of state law encompassed by the holding in *Northern Pipeline.* Disagreeing with this argument, the Court stated:

> Any right to compensation from follow-on registrants under § 3(c)(1)(D)(ii) for EPA's use of data results from FIFRA and does not depend on or replace a right to such compensation under state law. As a matter of state law, property rights in a trade secret are extinguished when a company discloses its trade secret to persons not

obligated to protect the confidentiality of the information. *Therefore registrants who submit data with notice of the scheme established by the 1978 amendments, and its qualified protection of trade secrets as defined in § 10, can claim no property interest under state law in data subject to § 3(c)(1)(D)(ii)* .... For purposes of compensation under FIFRA's regulatory scheme ... it is the "mandatory licensing provision" that creates the relationship between the data submitter and the follow-on registrant, and federal law supplies the rule of decision.

473 U.S. at 584–85, 105 S.Ct. at 3334–35 (citations omitted) (emphasis added).

Drexel cites the above underscored language and the Court's holding in *Monsanto* for the proposition that by submitting the Chronic Studies to the EPA, Uniroyal lost all U.S. state law property rights in those studies. Drexel misreads both cases.

■ The above cited underscored language of *Union Carbide* does not state that a data submitter abandons all state law property interests in data it submits to the EPA. Rather, read in context, the passage explains the Court's reasoning that an original data submitter abandons certain state law property rights in its data when it submits the data to the EPA in exchange for registration and the federal protections provided by FIFRA. Specifically, the abandoned rights are its ability to preclude the EPA from using or disclosing its data pursuant to FIFRA. The submitter retains all other state law property rights.

*Monsanto* likewise did not hold that an original data submitter abandons all state law property rights when submitting data to the EPA, but rather only that the submitter abandons those rights about which it could not have had a reasonable, investment-backed expectation that the EPA would keep the data confidential beyond the limits prescribed in FIFRA. 467 U.S. at 1006–07, 104 S.Ct. at 2874–75.

A reading of FIFRA itself also supports Uniroyal's position. Section 10(g), 7 U.S.C. § 136h(g), contains protections which bar a

foreign or multinational company from obtaining copies of such data submitted to the EPA. This provision demonstrates Congress' intent to protect the rights of data submitters not specifically abandoned under FIFRA's sections which permit the EPA restricted use and disclosure of the data.

We therefore reject Drexel's argument that Uniroyal abandoned all state law property rights in the Chronic Studies by submitting them to the EPA.

## V. *Drexel's Statements to the PSD May Have Been Misrepresentations of Fact*

Drexel next asserts that each count of the complaint is grounded in the assertion that Drexel made misrepresentations of fact in stating to the PSD that it had ownership rights in Uniroyal's Chronic Studies as a member of the MH Task Force. Drexel argues that Uniroyal's claims fail as a matter of law because Drexel did not state facts, but merely its non-actionable opinion regarding the interpretation of facts.

■ We need not address the parties' arguments over whether this issue may be properly decided on a Rule 12(b)(6) motion or whether it must be converted to a Rule 56 motion for summary judgment. In either event, dismissal of Uniroyal's tort claims would be premature and inappropriate. Uniroyal alleges the existence of additional oral communications with the PSD. Uniroyal has satisfied its pleading requirements, and prior to discovery, it would be improper for us to determine, from evidence presented only by Drexel, that Drexel's statements to the PSD were mere non-actionable opinion.

## VI. *Uniroyal's Claims for Tortious Interference, Unfair Competition, or Unjust Enrichment*

Drexel also argues the Uniroyal's claims for tortious interference with business expectancy, unfair competition, and unjust enrichment (Counts II, III and V) do not state valid causes of action and must be dismissed because each claim requires proof that Drexel engaged in improper conduct.[3] Drexel

---

**3.** The parties have not contended that there is a

choice of law issue, and for the purposes of this

asserts that no such improper conduct occurred.

■ Drexel argues that Uniroyal's assertions of fraud and misrepresentation collapse in the face of Drexel's actual communications with the PSD discussed above, which evidence only statements of opinion. We similarly reject this argument here. Again, Uniroyal has satisfied its pleading requirements and stated valid causes of action.

## VII. *CUTPA*

Lastly, Drexel argues that Uniroyal fails to state a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen. Stat. § 42–110a *et seq.* In order to prevail on a CUTPA claim, Uniroyal must establish that Drexel engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b. CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value *in this state.*" Conn.Gen.Stat. § 42–110a (emphasis added).

■ Reading the statute strictly, it appears that Uniroyal's allegations of tortious conduct under CUTPA must have occurred in Connecticut. Despite this language, at least one court has held that CUTPA does not necessarily require that a violation occur within Connecticut as long as it is tied to a form of trade or commerce intimately associated with Connecticut. *H & D Wireless Limited Partnership v. Sunspot,* Civil No. H–86–1026 (Feb. 24, 1987), 13 Conn.Law. Trib. No. 17, p. 22 (Feb. 24, 1987) (Dorsey, J.). In addition, at least under Connecticut's choice of law principles, a tort is deemed to have occurred where the injury was sustained, and in misrepresentation cases, the injury occurs where the "economic impact" is felt. *See Bailey Employment System, Inc. v. Hahn,* 655 F.2d 473, 476 (2d Cir.1981); *Hamma v. Gradco Systems, Inc.,* Civ. Nos. B–88–115 (JAC), B–89–437 (JAC), 1994 WL 91857

(D.Conn March 2, 1994) (Dorsey, J.). Uniroyal's CUTPA claim is premised on Drexel's misrepresentations, so if Connecticut's choice of law principles govern, it would appear reasonable to conclude that the CUTPA violation occurred in Connecticut.

Using either these choice of law principles or the "intimately associated" test set forth in *H & D Wireless,* supra, Uniroyal's complaint sets forth the necessary allegations to state a claim under CUTPA.

■ Finally, Drexel argues that even if Uniroyal's claims have a sufficient nexus to Connecticut, CUTPA does not apply to unfair practices which are comprehensively regulated by other bodies of law. Drexel asserts that since the registration of pesticide products is regulated by other bodies of law (FIFRA and U.K. law), tortious acts taken in connection with pesticide applications are not within the scope of CUTPA. In determining whether certain practices are encompassed by CUTPA, the Connecticut Supreme Court has considered: (1) whether the Federal Trade Commission rules apply to the practice; (2) the existence and scope of an alternative comprehensive regulatory scheme; (3) the absence of activity by the commissioner of consumer protection in this area; and (4) the case law of other jurisdictions. *Russell v. Dean Witter Reynolds, Inc.,* 200 Conn. 172, 510 A.2d 972 (1986).

The parties do not cite and our independent research has revealed no decision directly on point. We have found no decisions regarding FTC regulation of pesticide registrations, nor any decision by the commissioner of consumer protection relating to pesticide registration, and we agree with Uniroyal's assertion that the critical factor here is whether there is an alternative comprehensive regulatory scheme. Drexel has not alleged the existence of an alternative comprehensive regulatory scheme that would govern registration of pesticides abroad and provide Uniroyal a private right of action. Additionally, we note the broad and sweeping language of CUTPA. *See id.* at 178, 510 A.2d 972 ("We recognize the sweeping nature of the reference in § 42–110b(a) to 'de-

motion, we have decided all issues under Con-

necticut law.

ceptive acts or practices in the conduct of any trade or commerce' and the breadth of the definition of 'trade' and 'commerce' in § 42–110a(4).").

We need not decide whether actions taken in connection with a United States pesticide registration, governed by FIFRA, are exempt from CUTPA. Here we only hold that Uniroyal's allegations in connection with a pesticide registration in the U.K. are sufficient to state a claim under CUTPA.

## CONCLUSION

For the foregoing reasons, defendant's motion (Document # 18) is DENIED.

**SO ORDERED.**